# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
February 5, 2013 Session

## STATE OF TENNESSEE v. JEFFREY L. VAUGHN

**Appeal from the Circuit Court for Dyer County**
**No. 11CR230    Lee Moore, Judge**

**No. W2012-01987-CCA-R3-CD  -  Filed March 28, 2013**

The defendant was convicted of possessing more than 0.5 grams of cocaine with intent to sell or deliver, a Class B felony. The trial court sentenced the defendant to fourteen years as a Range II, multiple offender. On appeal, the defendant claims that the trial court erred by denying his motion to suppress cocaine that was seized by police after they searched his person. We conclude that the defendant waived this argument by failing to include it in his motion for new trial. The defendant also claims that the State violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by using two of its peremptory strikes to remove two African American potential jurors. We conclude that these potential jurors were removed for legitimate, nondiscriminatory reasons. Finally, the defendant claims that the trial court erred by allowing a felony drug conviction that was more than ten years old into evidence after the defendant denied that he sold drugs on the stand. We agree, but we conclude that the error was harmless. We affirm the judgments of the trial court accordingly.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Mr. Charles S. Kelly, Jr., Dyersburg, Tennessee, for the appellant, Jeffrey L. Vaughn.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Phillip Bivens, District Attorney General; and Karen Burns, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

**FACTS AND PROCEDURAL HISTORY**

On June 13, 2011, the defendant was indicted on a single count of possession of more than 0.5 grams of cocaine with intent to sell or deliver in violation of Tennessee Code Annotated section 39-17-417. Prior to trial, the defendant filed a motion to suppress certain evidence seized from his person by the police. The trial court held a hearing on said motion on October 11, 2011.

Officer Lynn Waller testified that on March 6, 2011, he was dispatched to a specific address on Ayers Street in Dyer County, Tennessee, in response to complaints made by residents in the neighborhood. According to the complaints, there was a small tan or beige vehicle that, on several occasions, had backed into a vacate house for a short period of time. On these occasions, another vehicle would drive up afterward, and after a short period of time both vehicles would leave. Residents reported concern about possible drug activity or burglaries.

Officer Waller testified that he and his backup officer arrived at the specified address at 6:32 p.m., as it was becoming dark. A car matching the description provided by residents was seen at the specified address, along with a gray pickup truck. Officer Waller witnessed the defendant exit the pickup truck on its passenger side. The defendant approached Officer Waller, and Officer Waller explained to him why the police were there. When Officer Waller asked the defendant who was with him, the defendant "said it was a friend of his but he didn't know her name." Officer Waller later determined that the second individual's name was Christina Hunt. Officer Waller testified that there were no other individuals present at the location.

Officer Waller testified that he asked the defendant if he had any weapons, and the defendant consented to a search- throwing his hands up in the air and saying "Yeah, go ahead and search me." Officer Waller conducted a pat-down, and he felt a lump in the defendant's pocket. Officer Waller asked the defendant about the lump, and the defendant said, "Go ahead and search me." Officer Waller testified that he pulled out a plastic bag containing six rocks, which were later tested and determined to be crack cocaine. Officer Waller testified that Ms. Hunt also consented to a search, and additional contraband was found on her person. Officer Waller testified that Ms. Hunt claimed that she had obtained the contraband from the defendant. She claimed that the defendant had given it to her in return for her having given the defendant "a ride to Halls to pay a bill."

Officer Waller testified that he handcuffed the defendant and placed him in the back of a patrol car. He testified that he gave the defendant *Miranda* warnings. Officer Waller testified that the defendant claimed that he had no idea how the crack cocaine had gotten into

his pocket.

On cross-examination, Officer Waller testified that he returned to the location in question the following day in an effort to determine if anyone actually lived at the specified address. While he was there, he spoke with a woman who lived across the street, who asked him how drug dealers had gotten into the neighborhood. He testified that he did not know if this woman was the same one who had initially reported the possible criminal activity.

Officer Waller testified that when the defendant approached him on the night in question, he noticed a bulge in the defendant's clothes. He testified that he always asked individuals that he approached about possible weapons if he saw such a bulge. Officer Waller testified that he did not ask either party that evening which vehicle they had been driving but that he already knew that the defendant drove the tan car because he had seen the defendant on prior occasions while he was working in Dyersburg. Officer Waller testified that he could not remember if he had ever arrested the defendant before.

Following this testimony, the State rested, and the defendant testified in his own defense. The defendant testified that he was at the address specified in Officer Waller's testimony on the night in question because he had gone there to feed the dogs of the girl who owned the house. He testified that Christy Hunt called him on the phone and asked him if he wanted to smoke some marihuana. He testified that he offered to share his last blunt with Ms. Hunt if she would give him "a ride to Halls." He testified that Ms. Hunt agreed after the defendant offered to pay her six dollars. He testified that they "went to Halls" together, and they had just returned when the officer arrived.

The defendant testified that when the police officer asked him what he was doing there, he replied, "I know the people that live here. I come to feed the dog." He testified that the officer told him to turn around and asked him if he had any weapons. After he said "no," the officer handcuffed him. The defendant testified that the officer said, "Don't you move a damn muscle." The defendant protested that he had done nothing wrong, and "[t]hat's when [the officer] went off in [his] pocket." The defendant testified that he gave no consent for this search. The defendant testified that a bag of powder "fell out" of his pocket. The defendant specifically testified that powder, not crack rocks, was recovered by the officer that evening. The defendant testified that he asked the officer to field test the substance on several occasions so that he could prove it was not crack, but the officer refused.

The defendant testified that he had never met Officer Waller prior to the evening in question. However, he testified that Officer Waller had once responded to a call at his girlfriend's house. He testified that while Officer Waller was there, he told the defendant's girlfriend that the defendant did not need to be with her "because she's White and I'm Black

and that she needed to get rid of [him].

On cross-examination, the defendant testified that the lady who lived at the specified address was named "Heather," but he admitted that he did not know her last name. He testified that he had known Heather for two years and that the two of them were "just friends." The defendant testified that he met Heather while he was working at a club called "the Fifty-Fifty Club."

The defendant testified that he did not own a tan Nissan, but he admitted that he had been driving one. He testified that he did not drive the vehicle on the night in question because it had a broken fuel pump. He testified that the vehicle had been sitting in the driveway of his friend's house for two days. The defendant testified that he did not believe that anyone had called the police to report that his vehicle had been coming and going from the specified address because the neighbors had been seeing him "come over there for about two years."

The defendant admitted that he had being carrying "soft" cocaine in his pocket on the evening in question. The defendant testified that he never intended to sell that cocaine to anyone. The defendant admitted that the police had recovered $200 from his pocket on the evening in question. The defendant testified that he had a job, but he admitted that he had never filed a tax return.

Following the defendant's testimony, Ms. Christina Hunt testified that on the evening in question she called the defendant and asked him "if he had any smoke." She testified that the defendant told her he had one blunt left and that "he needed a ride to Halls." She testified that she went "by there" to pick up the defendant, gave him a "ride to Halls," and then dropped him back off. She testified that the defendant had traveled to the specified address that evening by foot. Ms. Hunt testified that her cousin, Heather Sanders, lived at the residence. Ms. Hunt testified that there were two pitbull dogs in the house, and that her cousin had asked the defendant to feed them because she was not staying at the house regularly.

Ms. Hunt testified that she and the defendant were sitting in her truck talking when the police arrived. She denied that they were making a cocaine exchange. She testified that she was sitting in the truck when the defendant got out to talk to Officer Waller, and she was able to hear their conversation. She testified that she did not hear the defendant consent to a search. She testified that the defendant had his hands behind his back while he was being searched, but she was not sure whether or not he had actually been handcuffed prior to the search.

-4-

On cross-examination, Ms. Hunt testified that she had already pled guilty to misdemeanor possession of powder cocaine, and she had received six months probation. She testified that she had already had that cocaine with her when she arrived at the specified address. She testified that she received the cocaine from a woman named Brittian Calkins. She testified that Officer Waller was lying when he stated that she had told him that she had gotten the cocaine from the defendant on the evening in question.

Ms. Heather Sanders testified that she once rented the specified address on Ayers Street that was at issue in the case. She testified that she was acquainted with the defendant and that he was "just a friend." She testified that around the time period in question, she was in the process of moving back in with her mother, and she had asked the defendant to feed her dogs. She testified that she no longer had the dogs in question, and she explained that she had them "put to sleep because [she] couldn't travel back and forth and take care of them and [she] couldn't bring them to [her] mother's."

Ms. Sanders testified that she was aware that the defendant's car had been at her residence in the days prior to the incident. She testified that the defendant had told her that the car had either broken down or run out of gas. She testified that she had no personal knowledge concerning what events had transpired between the defendant and the police on the evening in question.

Following this testimony, the defense rested. The trial court found that Officer Waller had been dispatched to the specified address on the evening in question due to calls concerning activity at a vacant house. The trial court found that Officer Waller had discovered the defendant in a truck at the specified address and that the defendant had exited the vehicle. The trial court found that the defendant had consented to a search, and Officer Waller had found the crack cocaine on the defendant's person during the consensual search. Based on these findings of fact, the trial court denied the defendant's motion to suppress.

The defendant was tried before a jury on April 24, 2012. Officer Waller and his backup officer, Brian Peckenpaugh, testified in a manner largely consistent with Officer Waller's testimony at the motion to suppress. Officer Brian Anderson of the Dyerberg Police Department testified concerning chain-of-custody of the crack cocaine. Mr. Brock Sain, a Special Agent forensic scientist with the Tennessee Bureau of Investigation and an expert in drug analysis, testified that he tested a substance represented to him as being related to the defendant's case and determined that the substance was 1.63 grams of crack cocaine. After the State rested the defendant and Ms. Hunt testified in a manner largely consistent with their testimony at the motion to suppress. After being instructed, the jury retired to deliberate at 3:06 p.m. and returned with a verdict finding the defendant guilty as charged at 3:26 p.m. that same day.

At his sentencing hearing on May 29, 2012, the defendant was sentenced to fourteen years as a Range II, multiple offender. He filed a motion for new trial that same day, which was denied on June 19, 2012. A timely notice of appeal was filed afterward. Satisfied that the defendant's appeal is properly before this court, we proceed to consider his claims.

## ANALYSIS

The defendant claims that the trial court erred by (1) denying his motion to suppress certain evidence, (2) allowing the State to use peremptory strikes to remove two African-American potential jurors from the jury pool, and (3) admitting the defendant's felony drug conviction (which was more than ten years old) into evidence after the defendant denied that he sold drugs while he was on the stand. For the reasons that follow, we conclude that the defendant is not entitled to relief based on any of these claims, and we affirm the judgment of the trial court.

## I. DENIAL OF DEFENDANT'S MOTION TO SUPPRESS

The defendant contends that the trial court erred by denying his motion to suppress cocaine seized by police during a search of his person that occurred on March 6, 2011. We review a trial court's decision to deny a motion to suppress under the standard established in *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). *See, e.g, State v. Brotherton*, 323 S.W.3d 866 (Tenn. 2010); *R. D. S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008). Pursuant to the *Odom* standard, a trial court's findings of fact will be upheld so long as the evidence does not preponderate against them. *Odom*, 928 S.W.2d at 23. A trial court's application of the governing law to those facts is reviewed *de novo*. *R. D. S.*, 245 S.W.3d at 362. We do not revisit questions concerning the credibility of witnesses, the weight of the evidence, or the proper resolution of any conflicts in the evidence on appeal. *See Odom*, 928 S.W.2d at 23.

The defendant did not raise any claim of error by the trial court with respect to the denial of his motion to suppress in his motion for new trial. Tennessee Rule of Appellate Procedure 3(e) states, in pertinent part, that "no issue presented for review shall be predicated upon error . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). When a defendant raises an issue for the first time on appeal, this court will normally deem it waived. *See, e.g., State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996).

Although Rule of Appellate Procedure 36(b) and Rule of Criminal Procedure 52(b) afford this court the discretion to take notice of "plain errors" that were not raised in the proceedings below, this court will only grant relief under the "plain error" standard if the claim involves an error that probably changed the outcome of the trial and five additional

factors are satisfied. *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). These factors are: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice." *Id.* (*quoting State v. Adkisson*, 899 S.W.2d 626, 636 (Tenn. Crim. App. 1994). "[T]he presence of all five factors must be established by the record before [a reviewing court] will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.*

The defendant has not established the presence of the requisite factors. From our review of the record, it does not appear that any clear and unequivocal rule of law has been breached. The trial court found as matters of fact that the defendant approached Officer Waller (thereby initiating the contact with the police) and that the defendant consented to the search. Although the defendant strenuously disagrees with these findings, the evidence does not preponderate against them. Without overturning these factual findings, any ensuing search of the defendant's person by the police was almost certainly lawful under the consent exception to the warrant requirement. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973); *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992). Consequently, we cannot conclude that any clear and unequivocal rule of law was been breached by the trial court's decision to deny the defendant's suppression motion. The defendant's claim for relief is denied.

## II. *BATSON* CHALLENGE

The defendant contends that the State violated *Batson* when it used peremptory strikes to remove two African-American potential jurors from the jury pool. A "'State's purposeful or deliberate denial to [African-Americans] on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause.'" *Batson v. Kentucky*, 476 U.S. 79, 84 (1986) (*quoting Swain v. Alabama*, 380 U.S. 202, 203-04 (1965). After a defendant has alleged that a peremptory challenge has been exercised on racially discriminatory grounds, courts employ a burden-shifting approach when assessing the defendant's claim. As the U.S. Supreme Court explained in *Batson*:

> A black defendant alleging that members of his race have been impermissibly excluded from the venire may make out a *prima facie* case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. *Washington v. Davis*, [426 U.S. 229,] 239-242 [(1976)]. Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion. *Alexander*

*v. Louisiana*, 405 U.S. [625,] 632 [(1972)]. The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties. *See Alexander v. Louisiana, supra*, at 632; *Jones v. Georgia*, 389 U.S. 24, 25 (1967).

*Batson*, 476 U.S. at 93-94. Rather, the State must "articulate a neutral explanation related to the particular case to be tried." *Id.* at 98. This race-neutral explanation need not be "persuasive, or even plausible,"so long as the explanation displays no discriminatory intent. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). If the State provides a race-neutral explanation, then the trial court must decided under the totality of the circumstances if the reason provided by the State is pretextual. *Batson*, 476 U.S. at 98; *Purkett*, 514 U.S. at 768-69. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768.

When confronted with and ruling upon a *Batson* challenge, our supreme court has cautioned trial courts that they "'must carefully articulate specific reasons for each finding on the record, *i.e.*, whether a *prima facie* case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination.'" *State v. Hugueley*, 185 S.W.3d 356, 369 (Tenn. 2006) (quoting *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 906 (Tenn. 1996)). A trial court's findings are entitled to great weight and will not be set aside on appeal unless found to be clearly erroneous. *Woodson*, 916 S.W.2d at 906; *State v. Carroll*, 34 S.W.3d 317, 319 (Tenn. Crim. App. 2000).

In this case, the trial court appears to have addressed potential *Batson* concerns proactively. When the State challenged James Lyons, an African-American, during its first round of peremptory challenges, the trial court—without any prompting from the defense—asked the State to provide a racially-neutral reason for the strike. The State explained that it was striking Mr. Lyons because he had claimed that he had been friends with the defendant for years. The trial court stated that this reason was racially-neutral. When the State challenged another juror in Round 3, who was apparently also an African-American,[1] the State explained that it did so based on the fact that this potential juror had

---

[1] The transcript of the defendant's jury selection process does not reveal the identity of this juror, much less his or her race. The transcript as prepared appears to be missing some material, as it skips from the trial court stating "Let's move along" at the end of "Round 2" of the peremptory challenges straight into the prosecutor's articulation of a "racially neutral reason" for the striking of another juror in Round 3. The transcript from the motion for new trial reflects that both parties operated under the assumption that this juror was African-American, and the defendant likewise claims that the stricken juror was African-American in

(continued...)

previously employed the defendant, and the potential juror had also frequented the "Legend Club," an establishment associated with drug activity and violent crime by law enforcement officers. The trial court also stated that both these reasons were racially neutral.

We can find no further discussion of the issue in the record. It does not appear that the defendant ever actually objected to the prosecution's use of its preemptive strikes, or that the defendant otherwise raised the *Batson* issue until his motion for new trial. Consequently, it appears to us that the defendant waived his *Batson* claim by failing to raise a contemporaneous objection or filing timely motion concerning the issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The trial court's failure to engage in a more extended discussion of the *Batson* issue appears to be the natural result of the defendant's failure to raise it in a timely fashion.

It is possible that the defendant failed to raise a contemporaneous objection on the *Batson* issue because he interpreted the trial court's remarks as raising a *Batson* challenge *sua sponte*. He may further have interpreted the trial court's statements to the effect that the prosecution had provided racially-neutral explanations for striking both jurors as implicitly making the additional findings that, under the totality of the circumstances, no discrimination had occurred. Consequently, the defendant may have understood the *Batson* issue to have been contemporaneously raised and passed upon by the trial court. However, even if this court were inclined to ignore the defendant's waiver in light of this interpretation of the record, the defendant has failed to establish that the trial court erred by concluding that the State had no discriminatory intent.

One potential juror's status as the defendant's friend and the other potential juror's status as the defendant's prior employer provided the State with readily-defensible, racially-neutral reasons for striking them. By ruling in favor of the State, the trial court necessarily assessed the prosecutor's credibility and credited the State's proffered rationales. The trial court was in the best position to assess the demeanor of the prosecutor. The defendant directs our attention to nothing in the record that would establish that the trial court's determination was erroneous. The defendant's claim for relief on the grounds that the State violated *Batson* by striking two African-American potential jurors from the venire is denied.

---

[1](...continued)
his brief on appeal. However, we cannot discern this juror's race with certainty without knowing his identity. The State claims in its brief that the juror's name was Steven McClure, although the prosecutor stated at the motion for new trial that the juror's name was "Mr. Livingston." The defendant does not provide the name of either stricken juror in his brief.

### III. IMPEACHMENT WITH PRIOR FELONY CONVICTION

The defendant contends that the trial court erred by permitting the State to impeach him with a prior felony drug conviction that was more than ten years old. The scope, manner and control of the cross-examination of witnesses rests within the discretion of the trial court. *Coffee v. State*, 216 S.W.2d 702, 703 (1948); *Davis v. State*, 212 S.W.2d 374, 375 (1948). A trial court's decision concerning the admissibility of a prior conviction for impeachment purposes is reviewed under an abuse of discretion standard. *State v. Mixon*, 983 S.W.2d 661, 675 (Tenn. 1999). The defendant has failed to establish that the trial court abused its discretion by admitting evidence concerning the prior conviction at issue.

Prior to trial, the defendant filed a motion *in limine* to prevent the State from raising, *inter alia*, the issue of his prior felony convictions for selling cocaine in 1995 and 1990. The defendant urged that any use of these convictions by the prosecution would violate Tennessee Rule of Evidence 404(b), which prohibits the use of a defendant's prior crimes, wrongs, or bad acts for purposes of establishing that the defendant has a character defect and that the defendant acted in conformity with this character defect on any particular occasion. *See* Tenn. R. Evid. 404(b). The trial court granted the defendant's motion on the grounds that the potential prejudicial effect of the defendant's prior convictions for drug dealing outweighed their likely probative value. After so ruling, the trial court expressly warned the defense: "Now, you need to understand, [the defendant] and [defense counsel], that all this can change depending on what your client's testimony is."

During the defendant's cross-examination, the prosecutor asked the defendant if Christina Hunt had sent him "several text messages about purchasing or wanting to purchase some drugs along with several other people, different people. . . ." The defendant replied, "No, ma'am." The defendant then went on to testify: "You keep trying to say I'm selling things. I'm not selling. I don't sell drugs. I use them." Immediately following this testimony, a bench conference was held, and the court ruled over the defendant's objection that by so testifying the defendant had "opened the door" to impeachment with his prior convictions. The prosecutor went on to ask the defendant if he had been convicted of selling cocaine in 1990.[2] The defendant conceded that he had been convicted twenty-two years previously.

---

[2] The record does not reflect why the prosecutor did not impeach the defendant concerning his prior conviction for dealing cocaine in 1995. In the transcript from the motion for new trial, the prosecutor vehemently but erroneously maintains that she used the 1995 conviction, not the 1990 conviction, to impeach the defendant.

The defendant contends that the trial court's admission of this conviction for purposes of impeachment violated Tennessee Rule of Evidence 609. Pursuant to that Rule 609, "evidence that [a] witness has been convicted of a crime may be admitted" for impeachment purposes under certain circumstances. Tenn. R. Evid. 609(a). Rule 609 further provides:

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release. Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect.

Tenn. R. Evid. 609(b).

The defendant claims that the admission of his prior conviction from 1990 violated this rule. The defendant concedes that the State provided notice of its intent to use the defendant's 1990 conviction for impeachment purposes. However, the defendant claims that the trial court admitted the evidence of this conviction without considering whether the "probative value of the conviction . . . substantially outweighs the prejudicial effects." The defendant further argues that the admission of this conviction unduly prejudiced him in the eyes of the jury by painting him as a drug dealer.

The State urges that the trial court implicitly found that the probative value of this conviction outweighed its potential for prejudice when it made its ruling, and we agree. The record reflects that the trial court carefully considered the precise issue of whether the probative value of the defendant's prior drug dealing convictions outweighed their potential for prejudice when it granted the defendant's motion *in limine*. At that time, the trial court agreed with the defendant that the potential of the prior convictions to cause prejudice to the defense outweighed their probative value. However, the trial court expressly cautioned the defendant that this balance could shift, depending on his testimony.

When the defendant testified that he did not sell drugs, the probative value of his prior convictions increased appreciably. The trial court, having carefully considered the proper balancing of these two factors at the start of the trial, was not required to expressly restate its prior analysis or explicitly re-weigh these same factors before ruling that the defendant's

convictions could be admitted for impeachment purposes. The court's prior determination concerning the relative weight of the probative value and the potential prejudice of the convictions was implicitly incorporated in the trial court's ruling.

Even had the trial court failed in its duty to expressly weigh the factors as provided for in Rule 609, the remedy for such a violation is *de novo* review of the issue in this court. *State v. Lankford*, 298 S.W.3d 176, 182 (Tenn. Crim. App. 2008). Under either standard of review, we agree that the probative value of the defendant's 1990 conviction for drug dealing outweighed its potential for prejudice. The defendant testified under oath that he did not sell drugs. While the defendant did not specifically testify that he had never sold drugs at any point in the past, his claim under oath that he did not sell drugs (which was immediately preceded by his comments implying that the prosecutor was acting improperly by asking a series of questions insinuating that he ever would) certainly increased the probative value of his prior convictions. While admission of the prior conviction certainly posed some risk of prejudice to the defense—as our supreme court has noted, the "unfairly prejudicial effect of an impeaching conviction on the substantive issues greatly increases if the impeaching conviction is substantially similar to the crime for which the defendant is being tried," *Mixon*, 983 S.W.2d 674- nothing in Rule 609 requires a trial court to wait until after a defendant has affirmatively committed clear and unequivocal perjury before affording the State an opportunity to respond. The defendant's claim that the trial court erred by admitting his prior felony conviction into evidence is denied.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE